# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-00534-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-00536-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-00538-ADA** |
| *Plaintiff*, | § | **CIVIL ACTION 6:20-cv-00542-ADA** |
| | § | |
| **v.** | § | |
| | § | |
| **HUAWEI TECHNOLOGIES CO.** | § | |
| **LTD., ET AL.,** | § | |
| *Defendants.* | § | |
| | § | |

## PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF

**Table of Contents**

Table of Contents ......................................................................................................... i

Table of Authorities ................................................................................................... iii

Exhibits ....................................................................................................................... v

I.      Legal Standards ................................................................................................. 1

     A.      Claim Construction Generally ................................................................. 1

     B.      Indefiniteness .......................................................................................... 2

II.      U.S. Patent No. 7,095,713 (Case No. 6:20-cv-00534) ..................................... 2

III.      U.S. Patent No. 7,515,546 (Case No. 6:20-cv-00536) ..................................... 2

IV.      U.S. Patent No. 7,872,973 (Case No. 6:20-cv-00538) ..................................... 3

     A.      Terms with Disputed Constructions ....................................................... 3

           1.      "a message to the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filling" (claims 1 and 9)" ................................................... 3

           2.      "the message" (claims 1 and 9) ............................................... 4

           3.      "a module for, if the depth of the queue passes a predetermined threshold, sending a message to the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filling, thereby preventing packet discarding and loss by the queuing device" (claim 9) ................ 8

           4.      "a module for sending a message reporting the depth of the queue to the upstream device to thereby enable the upstream device to determine whether to reduce or increase the rate at which the upstream device sends packets to the queuing device" (claim 9) ....................................................... 8

           5.      "a module for sending the message from the e stream device to an upstream network device to thereby control a rate at which the upstream device receives packets from the upstream network device" (claim 9) ..................................................... 11

V.      U.S. Patent No. 8,249,446 (Case No. 6:20-cv-00542) ................................... 13

     A.      Terms with Disputed Constructions ..................................................... 13

1.   "[A method of / Apparatus for] regulating rogue behavior in
     an [optical network component comprising an optical
     transmitter / optical transmission device]" (claims 1 and 15)..............13

2.   "output indicator" (claims 1 and 15).......................................................15

3.   "output threshold" (claim 1) / "output indicator threshold"
     (claim 15)...................................................................................................17

## Table of Authorities

**Cases**

*Azure Networks, LLC v. CSR PLC,*
771 F.3d 1336 (Fed. Cir. 2014)........................................................................................ 1

*Castlemorton Wireless, LLC v. Bose Corp.,*
6:20-CV-00029-ADA, 2020 WL 6578418 (W.D. Tex. July 22, 2020)................................... 12

*C-Cation Techs., LLC v. Time Warner Cable, Inc.,*
2:14-CV-0059-JRG-RSP, 2015 WL 1849014 (E.D. Tex. Apr. 20, 2015)................................ 6

*CloudofChange, LLC v. NCR Corp.,*
No. 6-19-CV-00513-ADA, 2020 WL 4004810 (W.D. Tex. July 15, 2020)......................... 1, 2

*Comark Commc'ns, Inc. v. Harris Corp.,*
156 F.3d 1182 (Fed. Cir. 1998)........................................................................................ 1

*Cont'l Circuits LLC v. Intel Corp.,*
915 F.3d 788 (Fed. Cir.).............................................................................................. 3, 15

*Interval Licensing LLC v. AOL, Inc.,*
766 F.3d 1364 (Fed. Cir. 2014)....................................................................................... 7

*LG Electronics, Inc. v. Bizcom Electronics, Inc.,*
453 F.3d 1364 (Fed. Cir. 2006)..................................................................................... 10

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
572 U.S. 898 (2014).................................................................................................. 2, 4

*Phillips* v. *AWH Corp.,*
415 F.3d 1303 (Fed. Cir. 2005)........................................................................... 1, 13, 17

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.,*
844 F.3d 1370 (Fed. Cir. 2017)....................................................................................... 2

*Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n,*
988 F.2d 1165 (Fed. Cir. 1993)................................................................................. 4, 13

*Vitronics Corp. v. Conceptronic,*
90 F.3d 1576 (Fed. Cir. 1996)....................................................................................... 15

*Williamson v. Citrix Online,* LLC,
792 F.3d 1339 (Fed. Cir. 2015)....................................................................................... 8

*Zeroclick, LLC v. Apple Inc.,*
891 F. 3d 1003 (Fed. Cir. 2018)..................................................................................... 9

**Statutes**

35 U.S.C. § 112 ................................................................................................................... 2

**Exhibits**

| Exhibit | Description |
|---------|-------------|
| A | Appl. Ser. No. 11/377,578, Amendment of Jul. 27, 2010. |
| B | *Huawei Technologies Co., Ltd. v. WSOU Investments LLC d/b/a Brazos Licensing and Development*, IPR2021-00228, Petition for *Inter Partes* Review (Paper 2) (PTAB filed Nov. 30, 2020). |

Plaintiff WSOU Investments, LLC d/b/a Brazos License and Development ("WSOU") respectfully submits this claim construction brief in support of its proposed constructions.

## I.    Legal Standards

### A.    Claim Construction Generally

The general rule is that claim terms are generally given their plain-and-ordinary meaning. *Phillips* v. *AWH Corp.,* 415 F.3d 1303, 1312 (Fed. Cir. 2005) (*en banc), cert. denied*, 546 U.S. 1170 (2006); *Azure Networks, LLC v. CSR PLC,* 771 F.3d 1336, 1347 (Fed. Cir. 2014), *vacated on other grounds by* 135 S. Ct. 1846, 1846 (2015) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time."). The plain and ordinary meaning of a term is the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Philips,*415 F.3d at 1313. "'Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant* v. *Advanced Micro-Devices, Inc.,* 848 F.2d 1560, 1571 (Fed. Cir. 1988)). Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips,* 415 F.3d at 1317 (quoting *C.R. Bard, Inc.* v. *U.S. Surgical Corp.,* 388 F.3d 858, 862 (Fed. Cir. 2004)).

This Court recently explained that "[t]he 'only two exceptions to [the] general rule' that claim terms are construed according to their plain and ordinary meaning are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution." *CloudofChange, LLC v. NCR Corp.*, No. 6-19-CV-00513-ADA, 2020 WL 4004810, at *2 (W.D. Tex. July 15, 2020) (quoting *Thorner v. Sony Computer*

*Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "To act as his/her own lexicographer, the patentee must 'clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Id.* (quoting *Thorner,* 669 F.3d at 1365). And "[t]o disavow the full scope of a claim term, the patentee's statements in the specification or prosecution history must represent 'a clear disavowal of claim scope.'" *Id.* (quoting *Thorner,* 669 F.3d at 1366). "Accordingly, when 'an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable.'" *Id.* (quoting *3MInnovative Props. Co.* v. *Tredegar Corp.,* 725 F.3d 1315, 1326 (Fed. Cir. 2013)).

### B.    Indefiniteness

The Patent Act requires claims to particularly point out and distinctly claim the subject matter regarded as the inventions. 35 U.S.C. § 112, ¶ 2. To satisfy this requirement, the claim must be read in light of the intrinsic evidence to determine whether it informs one of skill in the art at the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910-11 (2014). To establish that a claim is indefinite, a patent challenger must prove indefiniteness by clear and convincing evidence. *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### II.    U.S. Patent No. 7,095,713 (Case No. 6:20-cv-00534)

Neither party currently contends that claim terms of the '713 patent require construction.

### III.    U.S. Patent No. 7,515,546 (Case No. 6:20-cv-00536)

Neither party currently contends that claim terms of the '546 patent require construction.

IV.     **U.S. Patent No. 7,872,973 (Case No. 6:20-cv-00538)**

    A.     **Terms with Disputed Constructions**

       1.     **"a message to the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filling" (claims 1 and 9)"**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a message controlling the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filing" |

This term should be given its plain and ordinary meaning.

***First***, Huawei errs by impermissibly attempting to add extraneous limitations that are neither required by claim language nor unambiguously required by either the specification or the prosecution history. *See*, *e.g.*, *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 788, 796–97 (Fed. Cir.), *cert. denied*, 140 S. Ct. 648 (2019); *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001).

***Second***, Huawei's construction of "a message ***controlling*** the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filing" uses the identical claim language ***except*** Huawei replaces the preposition "to" in the claim with the word "controlling" in Huawei's construction.[1] That Huawei uses the exact same claim language, nearly in its entirety, without proposing any definition for ***any*** of those other terms, only confirms that the claim language is plain on its face and no construction is required.

***Third***, Huawei's construction is also flawed because it ignores the surrounding claim language, which recites in broader context of "sending a message to the upstream device to reduce

---

[1]     Emphasis is added unless otherwise noted.

a rate at which packets are sent to the queuing device to prevent the queue from filling." There is no requirement in the claim language that the message "control[]" the upstream device merely that "a message" is sent "to" the upstream device. The plain reading of the claim language informs that it is the act of "sending" that "reduce[s] a rate a which packets are sent to the queuing device …." Huawei's misguided attempt to qualify the message itself as "controlling" is flawed. *See*, *e.g.*, *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.").

2.     **"the message" (claims 1 and 9)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

This term should be given its plain and ordinary meaning and the term is not indefinite because the claim language and specification informs one of skill in the art of the time of the invention "about the scope of the invention with reasonable certainty." *Nautilus,* 572 U.S. at 910-11. While Huawei has yet to articulate its indefiniteness theory, WSOU anticipates that Huawei will argue indefiniteness because the claim language twice recites to "sending a message" and then subsequently recites to "the message." The relevant portion of claim 1 is reproduced below with added references in brackets:

> [1b] if the depth of the queue passes a predetermined threshold, sending a message to the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filling, thereby preventing packet discarding and loss by the queuing device;
>
> [1c] sending a message reporting the depth of the queue to the upstream device to thereby enable the upstream device to determine whether to reduce or increase the rate at which the upstream device sends packets to the queuing device; and
>
> [1d] sending the message from the upstream device to an upstream network device

4

> to thereby control a rate at which the upstream device receives packets from the upstream network device.

'973 patent at 8:12-24. Independent claim 9 recites similar language.

Under the plain and ordinary meaning of the claim language, "the message" in element 1d is an antecedent reference to "a message" in element 1b. While all three elements 1b, 1c, and 1d recite "sending" either "a message" or "the message," only elements 1b and 1d specify that the sending of the message is to either reduce or control a rate. For instance, element 1b recites "sending a message to the upstream device *to reduce a rate*." Similarly, element 1d recites "sending the message from the upstream device to an upstream network device *to thereby control a rate* at which the upstream device receives packets from the upstream network device."

Reading "the message" in element 1d as an antecedent reference to "a message" in 1b also comports with the specification. Element 1b tracks the following description of one embodiment: "if the depth passes a predetermined threshold, a message is sent to the upstream device 120 to reduce a rate at which packets are sent to the queuing device 140 to prevent the queue from filling thereby preventing packet discarding and loss by the queuing device 140." '973 patent at 7:7-12. FIG. 1 (reproduced in annotated form below) depicts the upstream device 120 and queuing device 140 and the red arrow depicts the message sent to the upstream device 120:



FIG. 1 of the '973 patent (annotated)

The specification goes onto describe one embodiment where the queuing device in element 1b is then sent (described as "forward" or "relay") in element 1d: "the upstream device 120 may forward or relay a message from the queuing device 140 (i.e., with respect to controlling the rate at which packets are sent to the queuing device 140) to an upstream network device (not shown but similar to network device 110) in the network 100 to thereby control the rate at which the upstream device 120 receives packets from the upstream network device." *Id.* at 6:26-32. Annotated FIG. 1 illustrates the upstream network device in blue which is "not shown" in unannotated FIG. 1 but described as being "similar to the network device 110." *Id.* The orange arrow depicts how, in the embodiment, the upstream queuing device 120 "forward[s] or relay[s]" the message from the queuing device 140 to the upstream network device. Accordingly, the claims themselves and in context of the specification provide certainty as to the meaning of "the message." *See C-Cation Techs., LLC v. Time Warner Cable, Inc.*, 2:14-CV-0059-JRG-RSP, 2015 WL 1849014, at *17 (E.D. Tex. Apr. 20, 2015) (finding the claim term not indefinite under *Nautilus* when "viewed in context of the claim language itself and the specification there is a reasonable

certainty as to the antecedent basis").

In contrast to the relationship between elements 1b and 1d, the claim language of element 1c specifies that the message "report[s] the depth of the queue to the upstream device." Element 1c then specifies that the sending "enables the upstream device to determine whether to reduce or increase the rate at which the upstream device sends packets to the queuing device." Thus, in element 1c, the act of sending of the message itself does not affect rate. Rather, sending the message in 1c "enable[s]" the "upstream device to determine whether to reduce or increase the rate." Accordingly, "a message" in element 1c is not what is being referenced by the antecedent "the message" in element 1d, and this is not a situation where "no informed and confident choice is available among the contending definitions." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) (quoting *Nautilus*, 572 U.S. at 911 n.8) (internal quotation marks omitted). Here, the only possible reading is that "the message" in element 1d references "a message" in element 1b.

3.      **"a module for, if the depth of the queue passes a predetermined threshold, sending a message to the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filling, thereby preventing packet discarding and loss by the queuing device" (claim 9)**

4.      **"a module for sending a message reporting the depth of the queue to the upstream device to thereby enable the upstream device to determine whether to reduce or increase the rate at which the upstream device sends packets to the queuing device" (claim 9)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Subject to 35 U.S.C. § 112, ¶6<br><br>Indefinite for failure to disclose sufficient structure. |

Huawei errs in seeking to construe these two terms under 35 U.S.C. §112, ¶6 and as indefinite for failure to disclose sufficient structure for the reasons discussed below. Huawei's attempt to invoke 35 U.S.C. §112, ¶6 runs afoul of several well-established claim construction canons.[2]

**First**, the lack of the word "means" in both of these claim 9 terms raises a rebuttable presumption against applying Section 112, ¶ 6. *Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*).  While the burden lies with Huawei to rebut the presumption, it failed to articulate any argument or evidence in its Invalidity Contentions as allegedly rebutting, or even addressing, the presumption against applying Section 112, ¶ 6 to claim 9.[3]

**Second**, Huawei overlooks claim terms that connote structure to a person of ordinary skill in the art. The Federal Circuit reasoning in *Zeroclick, LLC v. Apple Inc.*, 891 F. 3d 1003, 1007–

---

[2]     WSOU has address both terms together given the overlap of issues but reserves the right to address any term-specific issues in subsequent briefing.

[3]     In its Identification of Extrinsic Evidence, Huawei has identified "[t]he testimony of Dr. Tal Lavian on the indefiniteness of claim[] … 9 of the '973 Patent," but has not provided the substance of Dr. Lavian's testimony.

09, (Fed. Cir. 2018) is instructive on this point. The Federal Circuit found the district court "legally erred by not giving effect to the unrebutted presumption against the application of § 112, ¶ 6," and that the district court's analysis was "couched in conclusory language" in concluding that "program" and "user interface code" were nonce words. Under *Zeroclick*, therefore, the words "program" and "code" are not properly considered *per se* nonce words in the context of the computing arts. Here, the claim language at issue is not purely functional, but rather recites specific structure that can perform respective tasks set forth in the body the claims.  Claim 9, for instance, is directed to "[a] system for incorporating a queuing ***device*** as a lossless processing stage in a ***network device*** in a ***communications network*** between an ***upstream device*** and a ***downstream device*** in the ***network device***, the system comprising: ***a processor*** coupled to the ***queuing device***; and, ***modules executed by the processor***, the modules including [the module term at issue here]." This claim language comports with the specification that describes that "the data processing system 300 includes computer executable programmed instructions for directing the system 300 to implement the embodiments of the present invention," and further that the "programmed instructions may be embodied in one or more software modules 331 resident in the memory 330 of the data processing system 300." '973 patent at 4:59-64. FIG. 2 (reproduced below) shows the relationship:



Thus, the claims do not merely recite a "module" but instead "modules executed by *processors*," where the modules can be resident in the memory. Both the processor and memory are sufficient structure. *See LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1372 (Fed. Cir. 2006), cert. granted, 128 S. Ct. 28 (U.S. 2007) (ruling that term "control unit" in a claim limitation reciting "a control unit for controlling the communication unit, wherein the control unit comprises a [central processing unit ('CPU')] and a partitioned memory system" was not a means-plus-function limitation) *rev'd on other grounds sub nom.* In *LG*, the Federal Circuit held that the presumption was not overcome because the "claim itself provides sufficient structure, namely 'a CPU and a partitioned memory system,' for performing the stated function, 'controlling the communication unit.'" Here, similar to *LG*, 35 U.S.C. §112, ¶6 should not be invoked because the claim itself provides sufficient structure, including memory and a processor. *See id.*

**5.**   **"a module for sending the message from the e stream device to an upstream network device to thereby control a rate at which the upstream device receives packets from the upstream network device" (claim 9)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning except that the phrase "e stream" should be "upstream" | Subject to 35 U.S.C. § 112, ¶6<br><br>Indefinite for failure to disclose sufficient structure. |

For this term, the same arguments that apply to the two prior "module" terms also apply to this term and are incorporated by reference.

In addition, while WSOU initially identified the above-listed term as having its plain and ordinary meaning, upon further reflection, WSOU now contends that the Court should construe just the phrase "e stream" within the overall term as "upstream" and that the balance of the term should be given its plain and ordinary meaning. The phrase "e stream" was introduced by a USPTO clerical error and should be construed here as "upstream" to correct that error. This error appears to have been introduced by the failure of the USPTO's processes to properly recognize text in a scanned document in the file history. This term was originally submitted via an Amendment to pending claim 9 (which issued as claim 9 as well), and did not include the "e stream" error:

Appl. Ser. No. 11/377,578, Amendment of Jul. 27, 2010, at 5-6 (highlighting added) (**Ex. A**).

There was no recitation of "e stream" in the file history, including the original application. Nevertheless, the '973 patent issued with the term "e stream" replacing "upstream" in the Amendment. "[D]istrict courts may correct an error in a patent where no certification has been issued if: (1) the correction is not subject to reasonable debate to a person of ordinary skill in the art based on consideration of the claim language and the specification; and (2) the prosecution history does not suggest a different interpretation of the claims." *Castlemorton Wireless, LLC v. Bose Corp.*, 6:20-CV-00029-ADA, 2020 WL 6578418, at *2 (W.D. Tex. July 22, 2020). Here, both prongs are met. Under prong (1), it does not appear that Huawei disputes that phrase "e stream" means "upstream." Huawei has not identified "e stream" separately and takes the position that the broader "module" phrase is subject to 35 U.S.C. §112, ¶6 and "[i]ndefinite for failure to disclose sufficient structure." To the extent Huawei maintains that no correction is necessary, such a position would not be "subject to reasonable debate to a person of ordinary skill in the art based on consideration of the claim language and the specification" for the reasons noted above. Under prong (2), the prosecution history does not suggest a different interpretation as noted above. Accordingly, the above-listed term should be given its plain and ordinary meaning except that "e stream" should be construed as "upstream."

12

V.     **U.S. Patent No. 8,249,446 (Case No. 6:20-cv-00542)**

    A.     **Terms with Disputed Constructions**

        1.     **"[A method of / Apparatus for] regulating rogue behavior in an [optical network component comprising an optical transmitter / optical transmission device]" (claims 1 and 15)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "[A method of/Apparatus for] regulating rogue behavior by a subscriber-based [optical network component comprising an optical transmitter/optical transmission device]" |

This term should be given its plain and ordinary meaning.

***First***, Huawei errs by attempting to replace the claim language that recites the simple prepositional phrase "in an" with "by a subscriber-based" in its construction. Huawei's "by a subscriber-based" language is impermissible because the language is neither required by claim terms nor unambiguously required by either the specification or the prosecution history of a patent. *See*, *e.g.*, *Cont'l Circuits*, 915 F.3d at 796–97; *Dayco*, 258 F.3d at 1327; *accord K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.").

***Second***, Huawei commits the "cardinal sin" of importing limitations from exemplary disclosure in the specification into the claims. *Phillips*, 415 F.3d at 1319–1320 ("One of the cardinal sins of patent law [is] reading a limitation from the written description into the claims.") (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)). In its proposed construction, Huawei attempts to modify the term "optical network component" as being "subscriber-based." But in the specification the phrase "subscriber-based" is only used in the specification with reference to one type of optical component, an ONT:

The present invention will now be described in terms of detecting rogue behavior in an ONT operating within a PON. It should be recognized, however, that *the present invention has applicability for use in other optical transmission devices and in other networks as well*. Again, it is noted that herein the term "ONT" is meant *to include* all subscriber-based optical network components.

'446 patent at 4:32-34.

The grammatical context of the passage cited above refutes Huawei's construction. The specification expressly states that the "present invention" applies to "other optical transmission devices and in other networks" and is not limited to ONTs. *See id.*; *accord id.* at Abstract ("The apparatus, *for example*, may be implemented in one or more of the ONTs in a PON."); *id.* at 9:54-56 ("Note that the sequences of operation illustrated herein are exemplary illustrations and not meant to exclude other embodiments."). Moreover, even if the scope of the terms "optical network component" (claim 1) or "optical transmission device" (claim 15) were limited to ONTs (which WSOU does not concede), the specification clarifies that the term "ONT" is open-ended and "meant *to include* all subscriber-based optical network components." *Id.* at 4:32-34. The specific use of the open-ended phrase "include" clearly shows that ONTs "include" subscriber-based optical network components but are not limited to such components.

***Third***, Huawei tacitly concedes that no construction of this term is necessary by not seeking construction of this term in parallel IPR proceedings involving the same patent. On November 30, 2020—just ***three weeks*** before the parties exchanged terms for construction—Huawei filed a petition for *inter partes* review of the '446 patent in the PTAB. *Huawei Technologies Co., Ltd. v. WSOU Investments LLC d/b/a Brazos Licensing and Development*, IPR2021-00228, Pet. for *Inter Partes* Review (Paper 2) (PTAB filed Nov. 30, 2020) ("IPR Petition") (**Ex. B**). Huawei's IPR Petition only seeks express construction of four terms, none of which are sought to be construed by Huawei before this Court. *See* IPR Petition at 8-9. While not seeking an express construction

of the preamble as it does before this Court, Huawei argued that its O'Byrne reference disclosed the limitations of the preamble of both claims 1 and 15 without making any reference to either "subscriber" or "subscriber-based." *Id.* at 17-18. Notably, the terms "subscriber" or "subscriber-based" do not appear in Huawei's IPR Petition. *See generally id.*

2.      **"output indicator" (claims 1 and 15)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "indicator indicating an optical output being transmitted " |

This term should be given its plain and ordinary meaning.

*First*, the "output indicator" requires no construction, particularly in view of the contexts in which it is recited in independent claims 1 and 15. For instance, claim 1 recites the step of "monitoring a selected optical transmitter *output indicator* during at least one monitoring window." '446 patent at 10:5-6. Claim 15 recites an apparatus comprising a "register for storing a suspect rogue flag if the ***output indicator*** monitor detects that an output indicator threshold has been exceeded during a monitoring window." *Id.* at 10:62-63. In identifying this term for construction, Huawei does not seek to define either "output" or "indicator." Rather, Huawei uses those same words in its construction, thereby confirming they should simply be afforded their plain and ordinary meaning.  Huawei errs, however, in seeking to add the extraneous limitations "an optical … being transmitted." This would violate the proscription against adding a limitation that is neither required by claim terms nor unambiguously required by either the specification or the prosecution history. *See, e.g., Cont'l Circuits*, 915 F.3d at 796–97; *Dayco*, 258 F.3d at 1327.

*Second*, the specification expressly states that not all output indicators need to be the output transmission itself. '446 patent at 5: 44-47 ("Here it is noted that the other output indicator, if any, is something other than the burst enable signal itself, which may sometimes if not frequently be

less successful when used in detecting rogue behavior."). Huawei's proposed construction expressly excludes at least a preferred embodiment and for at least that reason alone, should be rejected. *Vitronics Corp. v. Conceptronic*, 90 F.3d 1576, 1584-85 (Fed. Cir. 1996) (noting that a construction that reads out a preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support).

*Third*, as noted above, Huawei tacitly concedes that no construction of this term is necessary by not seeking construction of this term in parallel IPR proceedings involving the same patent. *See* IPR Petition at 8-9. While Huawei did not expressly seek construction of this term, Huawei did seek an implied construction before the PTAB that conflicts with the construction it now advocates before this Court. Namely, Huawei argues that the O'Byrne reference in its IPR Petition discloses the following claim element: "monitoring a selected *optical transmitter* output indicator during at least one monitoring window." IPR Petition at 18-28. In so taking that position, Huawei characterized O'Byrne in relation to that claim element as follows:

> Accordingly, these teachings by O'Byrne meet this claim element for monitoring a selected optical transmitter *output indicator* (e.g. amount of optical power, a period of time, or an amount of power past a threshold period of time, or other laser errors) during at least one monitoring window (e.g. one or all of the time slots 60, 62, and 64).

*Id.* at 21.

Thus, before the PTAB, Huawei takes the position that examples of "output indicator" means "amount of optical power, a period of time, or an amount of power past a threshold period of time, or other laser errors." *See id.* In contrast, before this Court, Huawei advocates that the very same term should mean "indicator indicating an optical output being transmitted." Huawei has not explained—before the PTAB or this Court— why it should be allowed to take contradictory claim constructions before the two forums involving the very same patent and the very same claim term.

16

### 3.    "output threshold" (claim 1) / "output indicator threshold" (claim 15)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "time length or a percentage of a total time window duration" |

This term should be given its plain and ordinary meaning.

**First**, Huawei commits the "cardinal sin" of importing limitations from exemplary disclosure in the specification into the claims. *Phillips*, 415 F.3d at 1319–1320 ("One of the cardinal sins of patent law [is] reading a limitation from the written description into the claims.") (quoting *SciMed*, 242 F.3d at 1340). In its proposed construction, Huawei attempts to limit the terms "output threshold" and "optical indicator threshold" as "time length or percentage of a total time window duration." But while the specification describes one preferred embodiment in relation to time or percentage of time, the specification is clear that "other embodiments" are not limited and can be "almost any value:"

> In a preferred embodiment, the monitoring 310 is performed during ranging because then the amount of time that the light source is on is expected to be relatively small. Rogue behavior will be relatively easy to detect. Monitoring can also be performed at other times as well, however, as will be discussed in more detail below. In either case, the monitoring reveals, by tracking one or more of the output indicators, the time during the monitoring window that the light source is on. This can be expressed, for example as a percentage of the total window duration. When the window closes, this percentage is compared (step 315) to a set ***threshold value***, for example 50%, to see if the threshold has been exceeded. Note that here, 50% is used as an example; in other embodiments, ***the threshold may be set to almost any value***.

'446 patent at 6:60-64.

The grammatical context of the passage cited above refutes Huawei's construction—a threshold can be "any value." *See id.*   Moreover, the specification describes the concept of "threshold" more broadly and consistent with its plain meaning as something that can or cannot be exceeded. *Id.* at 7:11-13 ("if the suspect rogue flag is set and a subsequent monitoring step measures a value that does not exceed the threshold value"); *id.* at 7:18-19 ("suspect rogue flag indicates activity exceeding a threshold").

**Second**, as noted above, Huawei tacitly concedes that no construction of this term is

necessary by not seeking construction of this term in parallel IPR proceedings involving the same patent. *See* IPR Petition at 8-9. While not seeking an express construction, Huawei in its IPR petition reads "output threshold" inconsistently with the narrow position it advocates before this Court.  For instance, before the PTAB, Huawei summarizes its position with respect to "output threshold" in claim 1 as follows:

> Accordingly, a POSITA would have recognized that the output threshold would be ***an amount of power threshold***, a period of time ***threshold, or an amount of power past a threshold period*** of time as taught by O'Byrne—and O'Byrne teaches this method using each of these thresholds.

IPR Petition at 31.

Thus, before the PTAB, Huawei asserts a broad, implicit construction of "output threshold" that would include not only time-based threshold but also ones based on power. In its IPR Petition, Huawei disclosed the existence of this Case and the scheduled *Markman* hearing. *Id.* at 8. But Huawei failed to explain why it is taking contradictory positions in the two parallel proceedings other than to state that the claim construction IPR proceedings were "[f]or purposes of this [IPR] proceeding only." *See id.* at 8. Nor does Huawei's IPR Petition reference the concept of "percentage of time" or the threshold being limited to a "window duration." The Court should not condone Huawei's inconsistent positions between the PTAB and this Court on the same patent for the very same term.

Dated: February 5, 2021             Respectfully submitted,

                    By:      */s/ Ryan Loveless*
                             James L. Etheridge
                             Texas Bar No. 24059147
                             Ryan S. Loveless
                             Texas Bar No. 24036997
                             Brett A. Mangrum
                             Texas Bar No. 24065671
                             Travis L. Richins
                             Texas Bar No. 24061296
                             Jeffrey Huang
                             Brian M. Koide
                             Etheridge Law Group, PLLC
                             2600 E. Southlake Blvd., Suite 120 / 324

Southlake, TX 76092
Tel.: (817) 470-7249
Fax: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Brett@EtheridgeLaw.com
Travis@EtheridgeLaw.com
Jhuang@EtheridgeLaw.com
Brian@EtheridgeLaw.com

Mark D. Siegmund
State Bar No. 24117055
mark@waltfairpllc.com
Law Firm of Walt, Fair PLLC.
1508 North Valley Mills Drive
Waco, Texas 76710
Telephone: (254) 772-6400
Facsimile: (254) 772-6432

*Counsel for Plaintiff WSOU Investments, LLC*

## CERTIFICATE OF SERVICE

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on this the 30th day of February 5, 2021.

*/s/ James L. Etheridge*
James L. Etheridge