# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### WACO DIVISION

| | | |
|---|---|---|
| **WSOU INVESTMENTS, LLC D/B/A** | § | **CIVIL ACTION 6:20-cv-00534-ADA** |
| **BRAZOS LICENSING AND** | § | **CIVIL ACTION 6:20-cv-00536-ADA** |
| **DEVELOPMENT,** | § | **CIVIL ACTION 6:20-cv-00538-ADA** |
| *Plaintiff,* | § | **CIVIL ACTION 6:20-cv-00542-ADA** |
| | § | |
| **v.** | § | |
| | § | |
| **HUAWEI TECHNOLOGIES CO.** | § | |
| **LTD., ET AL.,** | § | |
| *Defendants.* | § | |
| | § | |

**PLAINTIFF'S OPENING CLAIM CONSTRUCTION BRIEF**

## Table of Contents

Table of Contents ............................................................................................. i

Table of Authorities ........................................................................................ iii

Exhibits .............................................................................................................v

Abbreviations .................................................................................................. vi

I.      U.S. Patent No. 7,872,973 (Case No. 6:20-cv-00538) ...........................1

        A.      "a message to the upstream device to reduce a rate at which packets
                are sent to the queuing device to prevent the queue from filling"
                (claims 1 and 9)............................................................................1

        B.      "the message" (claims 1 and 9) ....................................................3

        C.      "a module for, if the depth of the queue passes a predetermined
                threshold, sending a message to the upstream device to reduce a rate
                at which packets are sent to the queuing device to prevent the queue
                from filling, thereby preventing packet discarding and loss by the
                queuing device" (claim 9) ............................................................5

        D.      "a module for sending a message reporting the depth of the queue to
                the upstream device to thereby enable the upstream device to
                determine whether to reduce or increase the rate at which the
                upstream device sends packets to the queuing device" (claim 9) .....5

        E.      "a module for sending the message from the e stream device to an
                upstream network device to thereby control a rate at which the
                upstream device receives packets from the upstream network device"
                (claim 9) ......................................................................................5

                1.      Huawei has failed to rebut the presumption against 35 U.S.C.
                        §112, ¶6 ...........................................................................5

                2.      Should the Court apply 35 U.S.C. §112, ¶6, the specification
                        discloses corresponding structure and algorithms.................7

II.     U.S. Patent No. 8,249,446 (Case No. 6:20-cv-00542) ...........................9

        A.      "[A method of / Apparatus for] regulating rogue behavior in an
                [optical network component comprising an optical transmitter /
                optical transmission device]" (claims 1 and 15) ............................9

                1.      The invention is not limited to "subscriber based"
                        components/devices.............................................................9

**2.     The Court should not condone Huawei taking inconsistent claim constructions before this Court and the PTAB on the same patent**.......................................................................**11**

**B.     "output indicator" (claims 1 and 15)**.................................................................**12**

**C.     "output threshold" (claim 1) / "output indicator threshold" (claim 15)**.........**14**

## Table of Authorities

**Cases**

*CloudofChange, LLC v. NCR Corp.*,
No. 6-19-CV-00513-ADA, 2020 WL 4004810 (W.D. Tex. July 15, 2020)............................ 2

*Cont'l Circuits LLC v. Intel Corp.*,
915 F.3d 797 (Fed. Cir.)........................................................................................................ 10

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed.Cir.2005)................................................................................................. 4

*EON Corp. IP Holdings LLC v. AT & T Mobility LLC*,
785 F.3d 616 (Fed. Cir. 2015)................................................................................................. 8

*Konami Corp. v. Roxor Games, Inc.*,
445 F. Supp. 2d 725 (E.D. Tex. 2006)..................................................................................... 4

*LG Electronics, Inc. v. Bizcom Electronics, Inc.*,
453 F.3d 1364 (Fed. Cir. 2006)............................................................................................... 7

*Liebe-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004)................................................................................................. 2

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)............................................................................................................ 3, 4

*O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*,
521 F.3ed 1351 (Fed. Cir. 2008)............................................................................................ 2

*OrthoPediatrics Corp. v. K2M, Inc.*,
Case IPR 2018-01546, Paper 10 (P.T.A.B. Feb. 14, 2019) .................................. 11, 12, 14, 15

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)............................................................................................. 11

*Sonix Tech. Co., Ltd. v. Publications Int'l,* Ltd.,
844 F.3d 1370 (Fed. Cir. 2017)............................................................................................... 5

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed.Cir.1985)................................................................................................. 2

*Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*,
988 F.2d 1165 (Fed. Cir. 1993)............................................................................................... 9

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)..................................................................................... 1, 2, 15

*Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*,
  587 F.3d 1339 (Fed. Cir. 2009)............................................................................... 3

*Williamson v. Citrix Online*, LLC,
  792 F.3d 1339 (Fed. Cir. 2015).......................................................................... 6, 7

**Statutes**

35 U.S.C. §112............................................................................................................. 7

**Exhibits**

| Exhibit | Description |
|---------|-------------|
| A | Appl. Ser. No. 11/377,578, Amendment of Jul. 27, 2010. |
| B | *Huawei Technologies Co., Ltd. v. WSOU Investments LLC d/b/a Brazos Licensing and Development*, IPR2021-00228, Petition for *Inter Partes* Review (Paper 2) (PTAB filed Nov. 30, 2020). |
| C | Appl. Ser. No. 12/649,606, File Wrapper. |

**Abbreviations**

| Exhibit | Description |
|---|---|
| Br. | Plaintiff's Opening Claim Construction Brief |
| POSITA | Person of ordinary skill in the art |
| Resp. | Defendants' Responsive Claim Construction Brief |
| '446 patent | U.S. Patent No. 8,249,446 |
| '973 patent | U.S. Patent No. 7,872,973 |

I.      **U.S. Patent No. 7,872,973 (Case No. 6:20-cv-00538)**

   A.     **"a message to the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filling" (claims 1 and 9)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a message ~~controlling~~ **instructing** the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filing" |

Huawei has proposed both initial and revised constructions as reflected above. Resp. at 1. Both constructions do not purport to *define* the claim language in question. For instance, Huawei's initial proposed construction *repeats the same claim language verbatim* and then impermissibly attempts to in replace the preposition "to" with "controlling." *Id*. Huawei's revised construction fares no better, and now attempts to interject the word "instructing" because – according to Huawei – the revised construction "more closely reflect the intrinsic evidence." Resp. at 1.

*First*, Huawei fails to articulate any legal basis to deviate from the heavy presumption of plain and ordinary meaning. Neither of the two *Thorner* exceptions—lexicography or disavowal— are even articulated by Huawei. *See Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Instead, Huawei infers that different standards govern, none of which have any legal basis.  Huawei claims that its proposed construction "accords with" the specification and prosecution history and that the "patent applicant's arguments evidences" its construction. Resp. at 2-4. Huawei fails to assert that the patentees "clearly set forth a definition of the disputed claim term,' and 'clearly express an intent to define the term.'" *Thorner,* 669 F.3d at 1365.

*Second*, Huawei's purported support in the specification is lacking. Notably, Huawei misrepresents that the "specification *states* that the upstream device 120 may be *instructed* to slow down or stop sending traffic…" Resp. at 2-3 (citing '973 patent at 5:55-60). But Huawei's that portion of the specification makes no reference to "instructed" or any form of the word. Nor do any of the other portions of the specification cited by Huawei. Br. at 2 (citing Fig. 1, 5:55-60, 6:3-8, 7:7-9, and 7:17-21). Contrary to Huawei's construction being "fully supported" by the specification as Huawei contends, the cited portions provide *zero* support.

***Third***, Huawei's grossly misreads the prosecution history. Huawei points to a statement by the applicants during prosecution that a prior art reference (Gupta) taught "a message ***instructing*** the ingress que to slow down the rate at which packets are dequeued." Br. at 3-4 (emphasis added) (quoting Ex. 1 at 3; Ex. 2 at 2, 4). Huawei then attempts to equate those statements with certain claim language, which Huawei calls "Message 1." *See* Resp. at 4. But Huawei fails to point to any statement by the applicants linking the cited portions of Gupta to "Message 1." Instead, Huawei resorts to mere attorney argument untethered to any evidence. *See id.* ("Gupta's direct command that dictates/instructs an ingress queue (the claimed upstream device) to slow down a rate of packets, which is Message 1"). *See id.* Huawei has thus failed to establish that Message 1 is "like Gupta's direct command." *See id.* Even if Huawei had linked the two concepts, Huawei has failed to show these statements in the prosecution history would rise to the level of "a clear disavowal of claim scope." *CloudofChange, LLC v. NCR Corp.*, No. 6-19-CV-00513-ADA, 2020 WL 4004810, at *2 (W.D. Tex. July 15, 2020) (quoting *Thorner*, 669 F.3d at 1366).

***Fourth***, Huawei errs by suggesting that WSOU's infringement positions should drive claim construction. For instance, "[a] claim is construed in the light of the claim language ... not in light of the accused device." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed.Cir.1985) (en banc); *accord Liebe-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 914 (Fed. Cir. 2004) ("[T]he court has 'admonished against judicial rewriting of claims to preserve validity.'"). Even if the accused devices were relevant to claim construction, Huawei does not seem to be certain that it understands WSOU's infringement theory, and instead resorts to speculation. *See* Resp. at 4 ("WSOU's interpretation is ***apparently*** based on the belief…"); 5 ("WSOU ***appears*** to agree …"); 6 ("WSOU ***appears*** to agree …").

***Fifth***, Huawei's attempt to invoke *O2 Micro* that there is "more than one ordinary meaning" is misplaced. Resp. at 4 (quoting *O2 Micro Int'l Ltd. v. Beyond Innov. Tech. Co.*, 521 F.3ed 1351, 1361 (Fed. Cir. 2008). Unlike *O2 Micro*, Huawei is not arguing plain and ordinary meaning, rather advocating a special meaning that would replace the word "to" with "instructing."

### B.    "the message" (claims 1 and 9)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Indefinite |

"A patent is invalid for indefiniteness if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 898–99 (2014). As WSOU explained, "the message" in element 1d is an antecedent reference to "a message" in element 1b. Element 1b recites "sending a message to the upstream device ***to reduce a rate***." Similarly, element 1d recites "sending the message from the upstream device to an upstream network device ***to thereby control a rate*** at which the upstream device receives packets from the upstream network device." The reference to either reducing or controlling a "rate" in both Elements 1b and 1d are flags that they are linked. WSOU also explained how its reading comports with the specification. Br. at 5-6. Huawei makes two primary arguments, both of which lack merit.

***First***, Huawei wrongly suggests that *Adpatix* is controlling because Huawei unilaterally declares the claim language here "extremely similar." Resp. at 7 (citing *Adaptix, Inc. v. AT&T Mobility LLC*, 2014 WL 12622422, at \*7-8 (E.D. Tex. Mar. 24, 2014)). Huawei, however, fails to acknowledge the rule that "[c]laim definiteness is analyzed ***not in a vacuum***, but ***always in light of the teachings*** of the prior art and of the ***particular application disclosure*** as it would be interpreted by one possessing the ordinary level of skill in the pertinent art." *Ultimax Cement Mfg. Corp. v. CTS Cement Mfg. Corp.*, 587 F.3d 1339, 1353 (Fed. Cir. 2009). Here, the intrinsic evidence (including the "particular application disclosure"), POSITA, and "pertinent art" are all different than *Adaptix*.[1]

***Second***, Huawei implies that improper antecedent basis is fatal to definiteness. That is not the law. Rather, "[t]he requirement for antecedent basis is a rule of patent drafting, administered during patent examination." *Konami Corp. v. Roxor Games, Inc.*, 445 F. Supp. 2d 725, 737 (E.D.

---

[1]   The two district court cases relied on by Huawei are similar to *Adaptix* in that their indefiniteness determinations are limited to the particular facts of those cases. *See* Resp. at 9.

Tex. 2006). Accordingly, the "failure to provide explicit antecedent basis for terms does not always render a claim indefinite." *Id.* (quoting Manual of Patent Examining Procedure § 2173.05(e) (8th ed. Rev. 2, May, 2004)). Notably, proper antecedent basis can be present by implication. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1319 (Fed.Cir.2005) (citing *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 810 F.2d 1113, 1117 (Fed. Cir. 1987)). Here, as WSOU has described how the claims, when read in view of the specification, "inform, with reasonable certainty, those skilled in the art about the scope of the invention." Br. at 4-7 (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 898–99 (2014)).

**Third**, contrary to Huawei's assertion, the intrinsic evidence does support that "the message" refers only to Element 1b (what Huawei terms as "Message 1"). As noted, the express reference to "reduce a ***rate***" in Element 1b is a flag that links the recitation of "to thereby control a ***rate***" in Element 1d. Br. at 5 ("only elements 1b and 1d ***specify*** that the sending of the message is to either reduce or control a rate"). The syntactically similar terms would flag for a POSITA that both Elements refer to the same "message." Huawei attempts to confuse the matter by engaging in existential questions about what it terms as Message 1 and Message 2 can or cannot do as described in the preferred embodiments. For instance, citing to the specification, Huawei argues that "Message 2 is [sic] also acts respect [sic] to controlling a rate of packets." Resp. at 10. But that entirely misses the point that the ***claim language*** of Elements 1b and 1d both ***specify*** that the sending of the message is to either reduce or control a rate. This contrasts with the Element of 1c that specifies that the message "report[s] the depth of the queue to the upstream device." Element 1c then specifies that the sending "enables the upstream device to determine whether to reduce or increase the rate at which the upstream device sends packets to the queuing device." Thus, in Element 1c, the act of sending of the message itself does not affect rate. Rather, sending the message in 1c "enable[s]" the "upstream device to determine whether to reduce or increase the rate." Accordingly, "a message" in Element 1c is not what is being referenced by the antecedent "the message" in Element 1d. Here, the only possible reading is that "the message" in Element 1d references "a message" in Element 1b.

4

***Fourth***, the prosecution history supports preserving definiteness. The language of Element 1d was added by amendment. **Ex. A** at 4. In doing so, the applicants specifically noted that they were incorporating into the independent claims "the upstream device 120 may forward or relay a message from the queueing device 140 ... to an upstream network device ... to thereby control the rate at which the upstream device 120 receives packets from the upstream network device." *Id.* at 17. The applicants then further noted that they "have incorporated a version of this subject matter into the independent claims to illustrate how traffic management occurs." *Id.* After highlighting Element 1d, the Examiner was able to understand and apply the term in performing a search for prior art and then issuing a notice of allowance. An "examiner's knowing allowance of claims based on the term that is now questioned" indicates that the claims are not indefinite. *Sonix Tech. Co., Ltd. v. Publications Int'l, Ltd.*, 844 F.3d 1370, 1381 (Fed. Cir. 2017).

C.  "a module for, if the depth of the queue passes a predetermined threshold, sending a message to the upstream device to reduce a rate at which packets are sent to the queuing device to prevent the queue from filling, thereby preventing packet discarding and loss by the queuing device" (claim 9)

D.  "a module for sending a message reporting the depth of the queue to the upstream device to thereby enable the upstream device to determine whether to reduce or increase the rate at which the upstream device sends packets to the queuing device" (claim 9)

E.  "a module for sending the message from the e stream device to an upstream network device to thereby control a rate at which the upstream device receives packets from the upstream network device" (claim 9)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning except that the phrase "e stream" should be "upstream"[2] | Subject to 35 U.S.C. § 112, ¶6<br>Indefinite for failure to disclose sufficient structure. |

1.  **Huawei has failed to rebut the presumption against 35 U.S.C. §112, ¶6**

Relying on selective portions of the claim language, Huawei's lead argument for invoking

---

2   Huawei does not dispute that the phrase "e stream" should be construed as "upstream" to correct a clerical error by the USPTO. *Compare* Br. at 11-12 (addressing clerical error) with Resp. at 11-17 (remaining silent).

§112, ¶ 6 is the that the claims at issue here and in *Williamson* both recited the word "module." Resp. at 12. *Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*). In *Williamson*, the claim at issue recited, *inter alia*, "a distributed learnings server … comprising … a distributed learning control module for receiving …" *Id.* at 1344. The Federal Circuit's emphasized that the prefix "distributed learning control" does not "impart structure into the term 'module'" and particularly noted that the written description fails to "impart any structural significance" to the "distributed learning control" term. *Id.* at 1351. The Federal Circuit also found probative that the "claim does not describe how the 'distributed learning control module' interacts with other components in the distributed learning control server in a way that might inform the structural character of the limitation-in-question or otherwise impart structure to the 'distributed learning control module.'" *Id.*

In contrast to the mere "module" of *Williamson*, claim 9 is directed to "[a] system for incorporating a queuing device as a lossless processing stage in a network device in a communications network between an upstream device and a downstream device in the network device, the system comprising: a processor coupled to the queuing device; and, ***modules executed by the processor***, ***the modules including*** [the module term at issue here]." Accordingly, each of the three modules do not merely recite mere "module[s]" but instead "***modules executed by processors***." The phrase "modules executed by processor, the modules including" imparts structure into the 3 module terms. Moreover, in contrast to *Williamson*, the above-quoted claim language recites how the three module terms interact with other structural components (e.g., the processor) that would inform of the structural character.

This claim language comports with the specification that describes that "the data processing system 300 includes computer executable programmed instructions for directing the system 300 to implement the embodiments of the present invention," and further that the "programmed instructions may be embodied in one or more software modules 331 resident in the memory 330 of the data processing system 300." '973 patent at 4:59-64. FIG. 2 shows the relationship. Here the claim phrase "modules executed by the processor, the modules including"

6

will "impart structure" into the 3 disputed terms. *See Williamson*, 792 F.3d at 1351. Moreover, the above-noted portions of the specification "impart any structural significance" to the 3 disputed terms. *See id.*

Huawei ignores this "modules executed by processor" claim language that WSOU highlighted (Br. at 9-10), and erroneously argues that "claim 9 provides high-level descriptions about various devices and a processor in in a network device, it ***fails to inform any structural character between the current modules and those devices***." Resp. at 12-13. But the recitation in 9 that the "modules [are] executed by processors" the claims are doing exactly that—informing the structural character between the 3 module terms and the processor (which Huawei tacitly concedes is structural). Indeed, Huawei does not dispute the holding of *LG Electronics* that found processors and memories constitute sufficient structure. Resp. at 13-14 (citing *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1372 (Fed. Cir. 2006); *see also* Br. at 10). Here, similar to *LG*, 35 U.S.C. §112, ¶6 should not be invoked because the claim itself provides sufficient structure, including the processor. *See id.*

## 2. Should the Court apply 35 U.S.C. §112, ¶6, the specification discloses corresponding structure and algorithms

Huawei tacitly concedes that WSOU has identified sufficient structure by identifying the memory (330) and/or processor (320 or 160) of a data processing system (300). Resp. at 14. Huawei nevertheless wrongly suggests that disclosure of a general purpose computer is not sufficient structure as a matter of law. Defendants' reliance on *Rain Computer, Inc*., Case No. 20-1646, Dkt. No. 45, is misplaced. *Rain Computer* does not stand for the proposition that a general-purpose computer is not structure for the purposes of overcoming *Williamson*. Instead, at the portion cited by Defendants, it was already determined that the term-at-issue was a means-plus-function term, and the Court was looking to the specification for the corresponding structure (and algorithm). *Id.*, at 7-9. *Rain Computer* is inapposite as to whether a computer is sufficient structure to prevent the application of § 112, ¶6 for a term that does not recite "means" in the first place. Huawei also mischaracterizes of *Eon*. In *Eon*, the Federal Circuit noted that "[i]t is well-established

that the corresponding structure for a function performed by a software algorithm is the algorithm itself," and then noted that because of this requirement to identify an algorithm "this court has consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor." *EON Corp. IP Holdings LLC v. AT & T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015). Thus, contrary to Huawei's suggestion, *EON* does not stand for the proposition that a general purpose computer cannot constitute structure.

Turning to the disclosed algorithm, Huawei's arguments essentially concede that algorithms are disclosed for each of the three module terms.  For the first two terms, Huawei acknowledges that FIG. 3 (which is described in the specification as a "flow chart illustrating operations of software modules within the memory of a data processing system ...") and corresponding descriptions arguably "disclose the algorithms." Resp. at 15. For the third element, Huawei acknowledges that a paragraph in the specification is "relevant to this function." *Id.* at 16. Huawei's core complaint is not that any algorithm is disclosed but whether a sufficient level of detail is provided. Huawei's only legal basis is the reference to an algorithm being a "step-by-step" procedure. Resp. at 16 (quoting *Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012). But nothing in *Ergo* or any authority cited by Huawei requires that the procedure be multiple steps or even a requisite level of detail as Huawei proposes. Algorithms are sufficiently disclosed in FIG. 3 and 6:26-32; 7:61-8:30.

II.     **U.S. Patent No. 8,249,446 (Case No. 6:20-cv-00542)**

A.     **"[A method of / Apparatus for] regulating rogue behavior in an [optical network component comprising an optical transmitter / optical transmission device]" (claims 1 and 15)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
| --- | --- |
| Plain and ordinary meaning | "[A method of/Apparatus for] regulating rogue behavior by a subscriber-based [optical network component comprising an optical transmitter/optical transmission device]" |

1.     **The invention is not limited to "subscriber based" components/devices**

Asserted claims 1 and 15 do not recite "subscriber-based," but merely a method or apparatus for "regulating rogue behavior in an" optical network component or optical transmission device. Nor was "subscriber-based" ever introduced into either of those terms over a span of nearly three years of prosecution before the USPTO. As WSOU noted (Br. at 13-15), Huawei's construction is improper because Huawei does seek to *define* the above phrase or a word within the above the phrase; rather, Huawei attempts interject the words "by subscriber-based" when the claim is silent. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."); *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) ("[C]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth.").

Turning to the specification, the Detailed Description starts by clarifying that the present invention is directed broadly to regulating rogue behavior in all optical transmission devices. '446 patent at 13-14 ("The present invention is directed to a manner of regulating rogue behavior in optical transmission devices."). Then, after acknowledging that the "present invention will now be *described* in terms of detecting rogue behavior in an ONT operating within a PON," the specification goes onto explicitly state (and with the intent of avoiding future confusion) that the invention is not limited to ONTs, noting that "*the present invention has applicability for use in other optical transmission devices and in other networks as well*." '446 patent at 4:32-34. Huawei presents a revisionist history of this excerpt (ironically employing the tactics is uses to misinterpret

the claim language) as "the present invention has applicability for use in other optical transmission devices **[such as ONU or MDU]**."   Resp. at 23.  By artificially interjecting the bracketed-underlined text in the prior quote, Huawei claims that the entire passage is limited to subscriber-based components. *Id.*

But that is not what this excerpt says.  ***First***, the excerpt defines that "the term 'ONT' is meant to include all subscriber-based optical network components." '446 patent at 4:32-34. The reference to "applicability for use in ***other*** optical transmission devices" means devices non-subscriber-based components (i.e., other than ONTs). ***Second***, the excerpt states that "the present invention has applicability for use … in ***other networks*** as well." *See id.* The reference to "other networks" is in reference to the "within a PON," which the specification defines as a passive optical network. In making both points, the applicants were expressly stating that their invention was not limited in any way, and particularly not limited to ONTs or PONs.

Pointing to recitations to "subscriber-based" in the specification, Huawei states that its position is "further evidenced" by the specification, and then points to various recitations of "subscriber-based" in the specification. Br. at 22-24; *see also id.* at 18-22. But the reference to "subscriber-based" in certain embodiments described the specification is wholly consistent with the description that the invention will be "***described*** in terms of detecting rogue behavior in an ONT operating within a PON," but that the "***the present invention has applicability for use in other optical transmission devices and in other networks as well***." '446 patent at 4:32-34. The fact that the specification describes certain subscriber-based system comports with the scope of the "present invention" being not limited to such subscriber-based components. Even if this had been the ***only*** disclosed embodiment, and it is not, the Federal Circuit has "expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Cont'l Circuits LLC v. Intel Corp.*, 915 F.3d 797 (Fed. Cir.) (citations omitted). For instance, Huawei is wrong to advance its claim construction because "the specification only teaches how to regulate a rogue behavior by a subscriber-based optical network component/device." Br. at 20. But *Phillips* "***expressly rejected*** the contention that

10

if a patent describes **only a single embodiment**, the claims of the patent must be construed as being limited to that embodiment." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) (noting that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.").

### 2. The Court should not condone Huawei taking inconsistent claim constructions before this Court and the PTAB on the same patent

Huawei admits that it offered its subscriber-based construction before this Court while at the same time failing to address any "subscriber" or "subscriber-based" construction. Resp. at 24. Huawei essentially claims that it is justified to speak out of both sides of its mouth in parallel proceedings before both forums because, given the particular reference it relied upon, "it is unnecessary to construe the current term in IPR proceedings." *See id.*

In the parallel IPR proceedings, Huawei sought the construction of four terms ("rogue behavior," "suspect rogue flag," "monitoring window," and "register") none of which Huawei seeks construction before this Court. Ex. B at 8-9. By stating in the IPR petition that "all terms should be construed according to the *Phillips* standard," and not seeking construction of the remaining terms, Huawei tacitly concedes that the plain and ordinary meaning applies to the term at issue here ("[A method of / Apparatus for] regulating rogue behavior in an [optical network component comprising an optical transmitter / optical transmission device]"). Thus, Huawei seeks a narrower construction before this Court while seeking a broader construction before the PTAB. In *OrthoPediatrics*, the PTAB found a similar situation unacceptable where the petitioner "fail[ed] to provide a claim construction" before the PTAB, which was "further compounded by the fact that Petitioner takes an inconsistent position before the District Court." *OrthoPediatrics Corp. v. K2M, Inc.*, Case IPR 2018-01546, Paper 10, at 11 (P.T.A.B. Feb. 14, 2019) ("*OrthoPediatrics*"). The PTAB denied institution of proceedings noting that "[b]y failing to reconcile its proffered claim construction here with its very different construction proffered in District Court … Petitioner

fails to satisfy this burden."[3] *See id.* While *OrthoPediatrics* addressed institution of an IPR proceedings, the same principles should forbid Huawei from taking inconsistent claim construction positions before this Court.

### B.   "output indicator" (claims 1 and 15)

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "indicator indicating an optical output being transmitted " |

Huawei's arguments regarding "output indicator" lack merit.

***First***, Huawei attempts to create a dispute about the ordinary meaning because purportedly the "term is not commonly known to a person of ordinary skill in the art." Resp. at 25. Tellingly, despite offering expert testimony for other propositions in its brief, Huawei provides no evidence (expert testimony or otherwise) to make this bald assertion. *See id.* Huawei's position that "output indicator" strains credulity when the term "output indicator" or the individual words "output" or "indicator" would not been understood by a POSITA. Indeed, Huawei is unable to point to any portion of the nearly three years of prosecution history where either the Examiner or the Applicants expressed any doubts as to the meaning of "output indicator." The term "output indicator" appeared in the originally filed set of claims. **Ex. C** at 106-104.[4] The Examiner was able to formulate search strategies, make rejections, and eventually allow the subject matter that included the term "output indicator." *See* **Ex. C** at 40-43 (search strategy); 30-36 (rejection); 6-10 (notice of allowance).

---

[3]   The procedural posture of *OrthoPediatrics* was more mature than the current posture here. In *OrthoPediatrics*, the District Court had issued a claim construction order at the time the PTAB denied institution. But given that the claim construction hearing is set for April 15-16, 2021 and the projected date for institution is set for June, this Court will likely have ruled on claim construction before the PTAB addresses institution. Accordingly, the procedural posture will be the same by the time of the projected institution date.

[4]   Exhibit C is the file wrapper for the '446 patent. Page numbers are references to the page number in the pdf document (as opposed to a page in a particular document within the file wrapper.

**Second**, Huawei commits the "cardinal sin" of importing limitations from exemplary disclosure in the specification into the claims. *Phillips*, 415 F.3d at 1319–1320 ("One of the cardinal sins of patent law [is] reading a limitation from the written description into the claims."). Huawei claim that its construction is "supported by the specification" is merely a guise for importing limitations from exemplary embodiments. Resp. at 25-27. The language Huawei uses to describe the specification essentially makes this admission. For instance, Huawei acknowledges that the specification describes "two **exemplary** output indicators: laser bias current ('LBC') and monitor photodiode current ('MPC')" and then concludes (without any evidentiary support) that "[n]either of these can be used to indicate an optical output being received by a receiver." *Id.* at 26. As an initial matter, Huawei concedes that these are merely "exemplary" embodiments. These "exemplary" embodiments do not define or limit the term "output indicator." *See Phillips*, 415 F.3d at 1323 (noting that "persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments.").

**Third**, WSOU had noted how Huawei tacitly concedes that no construction of this term is necessary by not seeking construction of this term in parallel IPR proceedings involving the same patent. *See* Br. at 16 (citing IPR Petition at 8-9). While Huawei did not expressly seek construction of this term, Huawei did seek an implied construction before the PTAB that conflicts with the construction it now advocates before this Court. Namely, Huawei argues that the O'Byrne reference in its IPR Petition discloses the following claim element: "monitoring a selected **optical transmitter** output indicator during at least one monitoring window." IPR Petition at 18-28. In so taking that position, Huawei characterized O'Byrne in relation to that claim element as follows:

> Accordingly, these teachings by O'Byrne meet this claim element for monitoring a selected optical transmitter **output indicator** (e.g. amount of optical power, a period of time, or an amount of power past a threshold period of time, or other laser errors) during at least one monitoring window (e.g. one or all of the time slots 60, 62, and 64).

*Id.* at 21.

Thus, before the PTAB, Huawei takes the position that examples of "output indicator"

means "amount of optical power, a period of time, or an amount of power past a threshold period of time, or other laser errors." *See id.* In contrast, before this Court, Huawei advocates that the very same term should mean "indicator indicating an optical output being transmitted." In its Response, Huawei now states that "[a]ll of those exemplary optical indicators from the [prior art in] the IPR are consistent with Huawei's proposed construction here because they are output indicators that can be used to specifically indicate the output power, time, or errors of an optical output being transmitted." Resp. at 27-28.

As noted above, Huawei should not be allowed to advance inconsistent claim construction positions in parallel before both forums. *See OrthoPediatrics* at 11. At a minimum, Huawei should have brought these inconsistent positions to the Court's attention. It is inconsistent for Huawei here to allege that "output indicator" is a "term is not commonly known to a person of ordinary skill in the art" before this Court and then advocate a specific meaning of "output indicator" before the PTAB.

C.    **"output threshold" (claim 1) / "output indicator threshold" (claim 15)**

| WSOU's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "time length or a percentage of a total time window duration" |

Huawei claims that it is not importing limitations from the preferred embodiments into the claims and instead merely applying "definitions" of "output (indicator) threshold" that the specification purportedly makes "three times." Resp. at 28. Huawei also suggests that its construction is somehow justified because "all the discussions are directed to only one preferred embodiment in relation to 'time length or a percentage of a total time window duration.'" *Id.* None of Huawei's justifications withstand any scrutiny.

With respect to the purported definitions, Huawei fails to articulate the correct legal standard for lexicography that would warrant deviation from the heavy presumption of plain meaning. "To act as his/her own lexicographer, the patentee must 'clearly set forth a definition of

the disputed claim term,' and 'clearly express an intent to define the term.'" *See Thorner*, 669 F.3d at 1365. All of the portions of the specification relied upon by Huawei are phrased in an open-ended fashion or limited expressly to a particular embodiment. Resp. at 28-30 (quoting '446 patent at 5:27-40 ("In accordance with *this embodiment* of the present invention … In *this embodiment*…"); *id.* at 6:50-59 ("In a preferred embodiment … This can be expressed, *for example*, as a percentage of the total window of the total window duration.")_. Both of the requirements of lexicography are lacking.  There is no "clearly set forth definition." And there is no "clearly expressed intent to define the term."

Huawei also attempts to rewrite the specification claiming that "the phrase 'the threshold may be set to almost any value' actually means that the threshold may be set to almost any time-related value with respect to a monitoring window, such as a different percentage other than 50% (e.g., 40%, 30%) of the window duration, or a time length expressed in another manner." Resp. at 29. Huawei provides no evidence for this gloss on the specification. *See id.* Rather, the specification merely states that the threshold "may be set to almost any value." '446 patent at 6:60-65. Huawei's reimagining of the text of the specification also conflicts with the portion of the specification that states that the monitoring "can be expressed, *for example as a percentage of the total time window*." *Id.* at 6:50-59. Thus, percentage of the total time window is only one way a threshold can be monitored. Huawei's artificially limiting this term to "time length or a percentage of a total time window duration" conflicts with these teachings of the specification.

WSOU has explained that Huawei failed to explain why it is taking contradictory positions in the two parallel proceedings other than to state that the claim construction IPR proceedings were "[f]or purposes of this [IPR] proceeding only." *See id.* at 8. Huawei does not deny that the positions are inconsistent but merely claims that it was not necessary to construe the term before the PTAB. Huawei should not be allowed to advance inconsistent claim construction positions in parallel before both forums. *See OrthoPediatrics* at 11.

15

Dated: March 19, 2021                    Respectfully submitted,

                          By:     */s/ Ryan Loveless*
                                     James L. Etheridge
                                     Texas Bar No. 24059147
                                     Ryan S. Loveless
                                     Texas Bar No. 24036997

Brett A. Mangrum
Texas Bar No. 24065671
Travis L. Richins
Texas Bar No. 24061296
Jeffrey Huang
Brian M. Koide
Etheridge Law Group, PLLC
2600 E. Southlake Blvd., Suite 120 / 324
Southlake, TX 76092
Tel.: (817) 470-7249
Fax: (817) 887-5950
Jim@EtheridgeLaw.com
Ryan@EtheridgeLaw.com
Brett@EtheridgeLaw.com
Travis@EtheridgeLaw.com
Jhuang@EtheridgeLaw.com
Brian@EtheridgeLaw.com

Mark D. Siegmund
State Bar No. 24117055
mark@waltfairpllc.com
Law Firm of Walt, Fair PLLC.
1508 North Valley Mills Drive
Waco, Texas 76710
Telephone: (254) 772-6400
Facsimile: (254) 772-6432

*Counsel for Plaintiff WSOU Investments, LLC*

## **CERTIFICATE OF SERVICE**

A true and correct copy of the foregoing instrument was served or delivered electronically via U.S. District Court [LIVE]- Document Filing System, to all counsel of record, on March 19, 2021.

                                   */s/ James L. Etheridge*
                                   James L. Etheridge